Kevin M. Cochrane (Cal. Bar No. 255266)
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
836 57th Street, Suite 472
Sacramento, CA 95819
Telephone: (916) 431-0126

Attorney for Plaintiff
PAUMA BAND OF MISSION INDIANS

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PAUMA BAND OF MISSION INDIANS**, a federally-recognized Indian tribe,<br><br>Plaintiff,<br><br>vs.<br><br>**GAVIN NEWSOM**, as Governor of the State of California; **STATE OF CALIFORNIA**; and **DOES 1 THROUGH 10**;<br><br>Defendants. | Case No.: _____<br><br>**COMPLAINT FOR FAILURE TO NEGOTIATE IN GOOD FAITH**<br><br>**[INDIAN GAMING REGULATORY ACT – 25 U.S.C. § 2710(d)(7)(A)(i)]** |

Case No.: _____

COMPLAINT OF PAUMA BAND OF MISSION INDIANS

## INTRODUCTION

1. The Pauma Band of Mission Indians ("Pauma" or "Tribe") brings this action for bad faith negotiation against Governor Gavin Newsom and the State of California ("State") pursuant to the Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. § 2701 *et seq*. Like the twelve other Indian tribes who filed suit in this District over the last two years, Pauma is still a party to one of the original form class III gaming compacts in the State of California ("1999 Compact"), and has been involved in rene-gotiations of that agreement since November 2014. Following Governor Newsom's inauguration at the outset of 2019, Pauma essentially had to restart its negotiations from scratch, and was eager to see if a new administration would bring with it a new mentality towards dealing with Indian tribes. Unfortunate-ly, the same issues that plagued the negotiations with Governor Edmund G. Brown, Jr. also plagued those with Governor Newsom. To wit, after more than two-and-a-half years of negotiations, the negotia-tion team selected by Governor Newsom has refused to budge from its original positions, insisting upon either including or excluding from the compact, as the case may be, the following terms, amongst oth-ers:

a) Insisting upon the payment of revenue sharing fees into a Special Distribution Fund ("SDF") to cover State expenses that are not directly related to the regulation of Indian gaming, such as those meant to cover conducting years-long compact negotiations and defending bad faith suits arising there-from, statewide general administrative expenses, and supplemental pension payments;

b) Insisting upon the payment of revenue sharing fees into a Revenue Sharing Trust Fund ("RSTF") above and beyond what is needed to fulfill the original purpose of the fund under the 1999 Compact of providing non- and limited-gaming tribes with $1.1 million in annual financial support;

c) Refusing to provide Pauma with any sort of enforceable form of exclusivity within the com-pact (or monetary remedy in the event exclusivity is breached) in order to justify the State's revenue sharing and other extraneous demands;

d) Insisting upon the inclusion of a provision that would require Pauma to enter into subordinate intergovernmental agreements ("MOUs") with localities and State agencies every time the Tribe under-takes a "Project" during the life of the compact – agreements that would require the payment of unde-fined yet provenly substantial sums of money, but nevertheless would not go before the Secretary of the

COMPLAINT OF PAUMA BAND OF MISSION INDIANS

Interior during the compact approval process so he or she can determine whether such payments, standing alone or in conjunction with the others required by the compact, are legal under IGRA;

e) Insisting upon the inclusion of a thirteen-page addendum containing State labor laws that is inaptly titled the Tribal Labor Relations Ordinance ("TLRO"), even though tribal gaming facilities are now subject to the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq*., and at least certain terms of the TLRO conflict with the NLRA and put tribes in a rather unfair position when dealing with labor unions;

f) Insisting upon riddling the compact with "violation" and "material breach" language that would allow the State to seek the termination of the compact for any number of reasons rather than a less draconian remedy that is more sensitive to and consistent with the continuing relationship created by IGRA;

g) Insisting upon the inclusion of a myriad of other regulatory provisions that both greatly encroach upon tribal sovereignty and greatly increase the costs of doing business, like by defining the "Gaming Facility" to include structures and areas other than the casino itself; imposing the State's minimum wage law; requiring the enforcement of the State's "earning withholding orders for support of a child, spouse, or former spouse;" prohibiting the cashing of any governmental checks; and waiving the Tribe's sovereign immunity up to many, many millions of dollars in potential damages for both claims sounding in tort and those brought by employees for workplace discrimination, harassment, or retaliation; and,

h) Refusing to confine the State's regulations to the compact itself, which would thus enable the State Legislature to demand concessions outside of the compact in order to obtain the ratification of the agreement – like that the Tribe execute a collective bargaining agreement with a particular labor union – or the State Gaming Agency to issue regulations and thereby generally regulate Pauma's reservation-based gaming facility during the life of the agreement.

2. In addition to insisting upon a very specific set of terms it wants included in the compact, the State has also been unwilling to negotiate for new class III gaming rights that are permitted under IGRA. Pauma originally sought to obtain new gaming rights from the last gubernatorial administration when it commenced negotiations in November 2014, but the most Governor Brown's negotiation team would

say after eighteen months of negotiations was that it was "open to discussion regarding the authorization of additional enumerated games," though it made no effort to either identify or discuss such games (let alone negotiate for them). Immediately after Governor Newsom came into office, Pauma re-raised the subject of new forms of class III gaming by requesting that the new administration provide those that are available to the Tribe on account of either (1) the creation of the State Lottery and/or the tribes' right to "conduct… lottery games" in Sections 19(d) and 19(f), respectively, of Article IV of the California Constitution; (2) the non-banked games currently being offered at card rooms around the State on top of their standard card games; and (3) the statutory scheme pertaining to the State's nonprofit fundraiser program at California Business and Professions Code Sections 19985 through 19987. Over the course of the last two-and-a-half years, Pauma proposed redlines for the new games it hopes to conduct around a dozen times, identified specific games, provided the rules for such games, met with the State at multiple negotiation sessions to discuss the subject in depth, and even sent the State supporting factual and legal materials to show how certain games challenged by the State can be legally operated by Indian tribes. However, none of this was sufficient to get the State to the point where it would even commit to negotiate for such games so the parties could then turn their collective energies to any subsequent regulatory issues. With the June 30, 2022 expiration date of the 1999 Compact just a year away, Pauma gave the State every opportunity to meaningfully negotiate and must now request the Court to issue an order holding the State has failed to negotiate in good faith, and consequently trigger the remedial scheme set forth in Section 2710(d)(7)(B) of IGRA.

## JURISDICTION AND VENUE

3. The district court has jurisdiction over this action pursuant to, *inter alia*, 25 U.S.C. § 2710(d)(7)(A)(i); 28 U.S.C. § 1331; and 28 U.S.C. § 1362.

4. The State has waived Eleventh Amendment immunity from suit in, *inter alia*, Cal. Gov't Code § 98005 and § 9.4(a) of the 1999 Compact.

5. Venue is proper in the United States District Court for the Eastern District of California under 28 U.S.C. § 1391(b) since Governor Gavin Newsom, his negotiator, his negotiation team, and his counsel are located in the Eastern District; counsel for Pauma is located in this District; a substantial part of the events giving rise to the claims herein occurred in this District; and since this action is related to a

dozen other suits brought by Indian tribes in this District challenging Governor Newsom's dutifulness in negotiations arising out of 1999 Compacts.

6. This action presents an actual and live controversy as to whether the State negotiated in bad faith with Pauma under IGRA. The district court has the power to remedy this dispute in accordance with the Prayer for Relief, *infra*.

## PARTIES

7. The Pauma Band of Mission Indians is a federally-recognized Indian tribe located within the external boundaries of the State California that is listed in the January 29, 2021 Federal Register as the Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California.

8. Gavin Newsom is the current Governor of the State of California and Pauma brings this suit against him in his official capacity.

9. The State of California is the thirty-first sovereign state of the United States.

## GENERAL ALLEGATIONS

### I.    BACKGROUND ON IGRA

10. The Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. § 2701 *et seq*., is a federal statute that sets forth the processes an Indian tribe must follow before it can engage in certain "classes" of gaming.

11. "Class III gaming" – the highest numerical class – is the most heavily-regulated of the classes of gaming and generally encompasses the games typically associated with Las Vegas and Atlantic City casinos.

12. Before offering games that fall within this particular class of gaming, an Indian tribe must first execute a compact with the surrounding state that may contain the regulatory provisions pertaining to the operation of the games sought. *See* 25 U.S.C. § 2710(d)(1)(C).

13. According to IGRA, this process begins when the "Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(A). From there, "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.*

14. Putting the general definition above aside, what specifically qualifies as a class III gaming activity is set forth in an earlier section of IGRA, which defines "class III gaming" as "all *forms* of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8).

15. The various forms of class III gaming are not set forth in the text of the statute, but have been largely detailed in an interpretive regulation issued by the National Indian Gaming Commission ("NIGC") – the federal agency vested with the statutory power to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of [IGRA]." 25 U.S.C. § 2706(b)(10); *see* 25 C.F.R. § 502.4 (May 11, 1992). That regulation, issued just four years after the enactment of IGRA, expands on the definition set forth in the statute by explaining that "Class III gaming means all forms of gaming that are not class I gaming or class II gaming, including but not limited to:"

(a) Any house banking game, including but not limited to –

(1) Card games, such as baccarat, chemin de fer, blackjack (21), and pai gow (if played as house banking game);

(2) Casino games such as roulette, craps, and keno;

(b) Any slot machines as defined in 15 U.S.C. § 1171(a)(1) and electronic or electromechanical facsimiles of any game of chance;

(c) Any sports betting and parimutuel wagering, including but not limited to wagering on horse racing, dog racing or jai alai; or

(d) Lotteries.

25 C.F.R. § 502.4.

16. The federal courts have two different views of what a state must negotiate for if a tribe sends a request to negotiate over a particular form of class III gaming. *See Northern Arapaho Tribe v. Wyoming*, 389 F.3d 1308, 1311 (10th Cir. 2004) ("*Northern Arapaho*") (detailing the two approaches and holding that the State of Wyoming negotiated in bad faith under either). The more expansive view has been adopted by the United States Court of Appeals for the Second Circuit and a district court within the United States Court of Appeals for the Seventh Circuit, and requires a state to negotiate for *all* class III gaming if any form of it is legal within the state. *See id.* (citing *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1031-32 (2d Cir. 1990) ("*Mashantucket*"); *Lac du Flambeau of Lake Superior Chippewa Indians v. Wisconsin*, 770 F. Supp. 480 (W.D. Wis. 1991)). The more restrictive approach adopted by the United States Court of Appeals for the Ninth Circuit requires a state to negotiate

for a specific form of gaming if any incident of such is legal within the state. *See id.* (citing, *e.g.*, *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1257-58 (9th Cir. 1994); *Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273, 278-79 (8th Cir. 1993); and further explaining "[i]t is clear under Wyoming law that the state regulates, rather than prohibits, calcutta and parimutuel wagering… The state is therefore clearly required to conduct negotiations with the Tribe concerning the full gamut of calcutta and parimutuel wagering.").

17. Thus, the way the negotiative process is supposed to work under IGRA is that a tribe can either request to continue conducting an existing form of class III gaming or to commence conducting a new form of class III gaming, and the state then consequently agrees to negotiate in good faith to enter into a compact covering *at least* the requested forms of gaming. *See* 25 U.S.C. § 2710(d)(3)(A).

18. During the consequent negotiations, the state is allowed to raise the seven specific subjects of negotiation that are set forth within the text of IGRA:

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).

19. However, the good faith duty means there are a number of things that a state cannot do during the course of the negotiations, one prominent and historically-recurrent example of such is set forth within the text of IGRA and prohibits a state from attempting to "impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." 25 U.S.C. § 2710(d)(4).

20. If the parties are able to successfully conclude a compact, the executed version of such is then sent to the Secretary of the Interior so he or she can review the terms and decide whether to approve the agreement – with notice of approval published in the Federal Register – or disapprove it for violating "(i) any provision of [IGRA]," including the prohibition on taxes set forth above, "(ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or (iii) the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B)(i)-(iii).

21. Conversely, if the parties are unable to conclude a compact for whatever reason, an Indian tribe has the statutory authorization to file a cause of action in federal district court "arising from the failure of the State… to conduct such [compact] negotiations in good faith." 25 U.S.C. § 2710(d)(7)(A)(i).

22. In the context of failed negotiations, an Indian tribe may invoke the court option after just one-hundred and eighty (180) days since the well-established "function of the good faith requirement… is to permit the tribe to process gaming arrangements on an expedited basis." *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1041 (9th Cir. 2010) ("*Rincon II*") (citing 25 U.S.C. § 2710(d)(7)(B)(i)).

23. When presenting the issue of good or bad faith to the court on a motion for judgment on the pleadings or during summary judgment, all a tribe has to do is "*[i]ntroduc[e]*… evidence" that "(I) a Tribal-State compact has not been entered into… and (II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith." 25 U.S.C. § 2710(d)(7)(B)(ii). With the introduction of such evidence, "[t]he burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(7)(B)(ii); *see* 134 Cong. Rec. 25377 (1988) (explaining IGRA "imposes the burden of proof on the State in any court test").

24. As for what is or is not bad faith, the federal courts have developed extensive jurisprudence on the subject over the last quarter century. Generally, a demand for "revenue sharing" above and beyond what is necessary to "defray the costs of regulating such activity" is bad faith unless the state has offered the tribe a meaningful concession in return. For instance, the State was able to obtain the heightened RSTF and SDF revenue sharing under the 1999 Compact because it supported Proposition 1A, a

Case No.: _____
COMPLAINT OF PAUMA BAND OF MISSION INDIANS

measure that amended the California Constitution and thereby gave tribes the "exclusive right to conduct class III gaming in the most populous state in the country." *In re Indian Gaming,* 331 F.3d 1094, 1114-15 (9th Cir. 2003) ("*Coyote Valley II*"). However, the true value of this concession has been called into question recently by an opinion from the Ninth Circuit that held tribes may have no way to actually enforce this exclusivity through their compacts since "California law does not permit the State to 'contract away its right to exercise its police powers.'" *Yocha Dehe Wintun Nation v. Newsom*, 830 F. App'x 549, 551 (9th Cir. 2020) (citing, *e.g.*, *Summit Media LLC v. City of Los Angeles*, 211 Cal. App. 4th 921, 934 (2012)). The same principle, though, of having meaningful concessions counterbalance demands applies to other types of revenue sharing as well, though certain ones like general fund revenue sharing are so repugnant to the purpose of IGRA that it is "difficult" for the Ninth Circuit to "imagine what concessions the State could offer to rebut the strong suggestion of bad faith arising from such demands." *Rincon II*, 602 F.3d at 1036.

25. The common law is just as if not more developed when it comes to detailing a state's obligations when negotiating a particular form of class III gaming requested by an Indian tribe. Out of these authorities come the principles below that a state cannot:

a) refuse or otherwise fail to negotiate (*see Mashantucket*, 913 F.3d at 1024);

b) make an erroneous determination about the legality of a requested form of gaming (*see Mashantucket*, 913 F.2d at 1032-33 ("The statutory terms are clear, and provide no exception for sincere but erroneous legal analyses."));

c) try to negotiate for only some portion of a requested form of gaming by, *inter alia*, insisting upon the same terms that apply to state or commercial actors when offering such within the state (*see Northern Arapaho*, 389 F.3d at 1313 ("When a state refuses to negotiate beyond state law limitations concerning a game that it permits, the state cannot be said to have negotiated in good faith under IGRA given the plain meaning of the statute."));

d) act in a protectionist manner (*see Coyote Valley II*, 331 F.3d at 1115 ("Congress did not intend to allow States to invoke their economic interests 'as justification… for excluding Indian tribes from' class III gaming; nor did Congress intend to permit States to use their compact requirement 'as a justification… for the protection of other State-licensed gaming enterprises from free market competition with

Indian tribes'" (quoting S. Rep. No. 100-446, 13 (1988)))); or,

e) engage in surface bargaining by, *inter alia*, failing to make "counter-proposals" or "counter-suggestions" to the demands of an Indian tribe with respect to a requested form of gaming (*see Flandreau Santee Sioux Tribe v. South Dakota*, 2011 U.S. Dist. Lexis 68531, *11 (D.S.D. 2011) (citing, *e.g.*, *NLRB v. George P. Pilling & Son Co.*, 119 F.2d 32, 37 (3d Cir. 1941) ("Agreement by way of compromise cannot be expected unless the one rejecting a claim or demand is willing to make counter-suggestion or proposal. And, where that is expressly invited but is refused, in such circumstances the refusal may go to support a want of good faith, and, hence, a refusal to bargain."))).

26. If a court finds that a state has failed to carry its burden to prove that it negotiated in good faith with an Indian tribe "to conclude a Tribal-State compact governing the conduct of [the requested] gaming activities," it then triggers a tripartite remedial scheme set forth within IGRA that begins with sixty (60) days of renewed negotiations between the parties. *See* 25 U.S.C. § 2710(d)(7)(B)(iii).

## II. COMPACTING IN CALIFORNIA AND PAUMA'S 1999 COMPACT

27. As part of the negotiations for the 1999 Compact, the people of the State of California approved a ballot measure known as Proposition 1A, the effect of which was to amend the California Constitution to include the language set forth below that would expressly enable Indian tribes to offer three discreet forms of class III gaming – slot machines, house banked card games, and lottery games:

> (f) Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.

Cal. Const. art. IV, § 19(f).

28. Curiously, the compact resulting from the foregoing negotiations, and the one Pauma executed, provided the tribes with the right to operate the first two forms of class III gaming *carte blanche*, but limited the grant of lottery games to just those "that are authorized under state law to the California State Lottery."

29. The California State Lottery was created under a prior subsection of the California Consti-

tution, and the way in which it operates is that it amends its regulations to self-authorize any new games it wants to put into commercial operation. The most recent version of those regulations as of the date of this filing – *i.e.*, September 24, 2020 – includes a Section 3 that lays out the ten (10) specific lottery games the California State Lottery presently offers, with the respective subsections for each of these ten games beginning with an "Authorization" provision that uniformly states "[t]he California Lottery may conduct [insert name of game] pursuant to these rules and regulations."

30. Section 12 of the 1999 Compact describes the various ways in which the parties can modify the agreement through either amendments or renegotiations, with Section 12.2 therein stating that "[t]his Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose."

31. Invoking this section, Pauma sent the prior gubernatorial administration a letter dated November 24, 2014 in which the Tribe triggered renegotiations of the 1999 Compact so it could offer forms of class III gaming that were not authorized under the agreement either in whole or in part. One such requested type of gaming was "lottery games… that are not currently authorized under State law to the California State Lottery," and the Tribe explained in its communication that it wanted to operate the full gamut of lottery games, including those offered by the Multi-State Lottery Association or other multi-state or state lottery associations.

32. Yet, after more than eighteen months of negotiation, the most Governor Brown's negotiation team would do is insert a comment into the draft compact to explain that it was "open to discussion [though not necessarily negotiation] regarding the authorization of additional enumerated games" at some unidentified point in the future.

33. The transition of chief executives from Governor Brown to Governor Newsom brought with it a restart of the negotiations. After the negotiation team assembled by Governor Newsom explained in the early spring of 2019 that it ratified, and thus wanted to work off of, the last draft compact transmitted by Governor Brown, Pauma sent a responsive draft compact on April 24, 2019 that included additional class III gaming rights above and beyond those conferred by the 1999 Compact based upon three different laws or realities within the State.

34. The first of these is Sections 19(d) and 19(f) of Article IV of the California Constitution that

created the California State Lottery and granted Indian tribes the right to offer lottery games, respectively. *See* Cal. Const. art. IV, §§ 19(d) & 19(f).

35. Based upon these Constitutional provisions, Pauma again requested the right to offer lottery games generally – and not just the ten (10) games currently authorized to the California State Lottery. Without counting its final compact offer, Pauma conveyed this request to Governor Newsom on twelve (12) separate occasions, in compact drafts dated November 15, 2018; April 24, 2019; September 30, 2019; October 11, 2019; November 13, 2019; January 3, 2020; January 20, 2020; February 19, 2020; June 22, 2020; November 23, 2020; and March 30, 2021. Along with making this request, Pauma also identified specific new lottery games it wanted to have included in the compact (like the Lucky for Life and Cash4Life multi-state lottery games), provided the State with the rules for such games, met with the State on multiple occasions to discuss such games, and even sent the State materials to prove that such games are legal and can be (and are) offered by Indian tribes.

36. The second of these arises from the fact that many of the seventy-four (74) or so card rooms in the State of California commercially offer types of non-banked games other than card games that would qualify as class III gaming under IGRA. For instance, the Bicycle Casino in Los Angeles offers multiple tile-based games that include Pai Gow Tiles and variations thereof like Bonanza Pai Gow Tiles and Reverse Bet Pai Gow Tiles. *See* State of California Department of Justice, *Card Rooms List – The Bicycle Casino*, *available at* https://oag.ca.gov/gambling/cardroomlist (last visited June 4, 2021). The nearby Hawaiian Gardens casino that is also in Los Angeles likewise offers various iterations of Pai Gow tiles, while the Parkwest Casino in Sacramento offers not only Pai Gow but Mah-Jong as well. *See*, *e.g.*, State of California Department of Justice, *Card Rooms List – Parkwest Casino Lotus*, *available at* https://oag.ca.gov/gambling/cardroomlist (last visited June 4, 2021).

37. Based upon the card rooms operating these games (and doing so with the approval of the Department of Justice no less), Pauma requested the right to offer any non-banked games that would be considered class III gaming under IGRA, and not just the specific tile games approved for play at the card rooms. Without counting its final compact offer, Pauma conveyed this request to Governor Newsom on twelve (12) separate occasions, in compact drafts dated November 15, 2018; April 24, 2019; September 30, 2019; October 11, 2019; November 13, 2019; January 3, 2020; January 20, 2020;

February 19, 2020; June 22, 2020; November 23, 2020; and March 30, 2021. Along with making this request, Pauma also identified specific new non-banked games it wanted to have included in the compact (like Mah Jong and Pai Gow, as well as private or "street" craps), provided the State with the rules for such games, met with the State on multiple occasions to discuss such games, and would have provided the State with additional supporting materials to try and resolve any disputed issues had the State requested them.

38. In a similar vein, the third of these arises from the enactment of a statutory scheme in the Business and Professions Code to permit the 72,000 or so nonprofits in the State of California to hold gambling-based fundraisers. *See* California Association of Nonprofits, *Causes Count – The Economic Power of California's Nonprofit Sector* p. 11, *available at* https://calnonprofits.org/images/downloads/causes-count-808.pdf (last visited June 4, 2021) (detailing the number and types of non-profits in California). On its website, the Department of Justice explains that the "comprehensive information pertaining to these types of fundraisers" is found in "Business and Professions Code sections 19985 through 19987." *See* State of California, Department of Justice, *Nonprofit Organization Gambling Fundraiser Registration Program*, *available at* https://oag.ca.gov/gambling/charitable (last visited June 4, 2020). The indicated sections allow any established non-profit or chapter thereof to conduct annual fundraisers using "controlled games." *See*, *e.g.*, Cal. Bus. & Prof. Code § 19986(b), (e). With certain exceptions that are not material to this discussion, the term "controlled games" is defined in Section 337j(e)(1) of the Penal Code as "any poker or Pai Gow game, and any other game played with cards or tiles, or both, and approved by the Department of Justice, *and any game of chance*, including any gambling device, played for currency, check, credit, or any other thing of value *that is not prohibited and made unlawful by statute or local ordinance*." Cal. Penal Code § 337j(e)(1) (emphasis added). Obviously, the first and second clauses of the foregoing definition make tile games available to non-profits for use in their fundraisers. Moreover, the final catch-all clause permits any other type of gaming that is not prohibited by statute, with the principal section detailing such proscriptions being Section 330 of the Penal Code. *See* Cal. Penal Code § 330. That section lists a number of specific games and types of games that are prohibited within the State of California, but some games that are omitted from this proscription are non-banked card games (which has given rise to the card room industry) and non-banked dice games. *See id.*

39. Based upon the statutory scheme for nonprofit fundraisers, Pauma requested the right to offer any class III gaming that would arise out of the statutory definition of controlled games, and not just the specific games currently authorized by the Department of Justice for play at specific fundraisers. Without counting its final compact offer, Pauma conveyed this request to Governor Newsom on twelve (12) separate occasions, in compact drafts dated November 15, 2018; April 24, 2019; September 30, 2019; October 11, 2019; November 13, 2019; January 3, 2020; January 20, 2020; February 19, 2020; June 22, 2020; November 23, 2020; and March 30, 2021. Along with making this request, Pauma also identified specific new non-banked games it wanted to have included in the compact (like private or "street" craps, as well as Mah Jong and Pai Gow), provided the State with the rules for such games, met with the State on multiple occasions to discuss such games, and would have provided the State with additional supporting materials to try and resolve any disputed issues had the State requested them.

40. In response to Pauma's requests for new lottery games, the State admitted that the Tribe could operate games beyond those authorized to the California State Lottery, but it would never actually negotiate on the topic by making a single counter-proposal or taking any other action that would evidence discernable progress on the subject. Rather, the passage of time in the negotiations simply brought regress rather than progress, as the State ultimately explained it was concerned that the Tribe's participation in the lottery industry, amongst other things, "would have the potential to hurt the CSL's brand," and, it may be the case that it is neither legal nor feasible for the Tribe to even "offer[] CSL products," the language of the 1999 Compact notwithstanding. In other words, the State conveyed its belief that Pauma could not license or otherwise participate in lottery games offered by the State of California or any other outside jurisdiction, and it never abandoned this belief for the remainder of the negotiations. Thus, discussions that started with a request to obtain new lottery games ended with the State communicating its well-wrought belief that the only thing a tribe can legally offer are games it invents and offers on its own – the sort that have minimal jackpots and could never draw in significant customers, let alone compete with the California State Lottery.

41. As for Pauma's requests for non-banked games and other controlled games that qualify as class III gaming under IGRA, the State admitted that the Tribe can offer any "controlled game," but – akin to the lottery games language of the 1999 Compact – it would only consider allowing the Tribe to

offer those specific games the California Department of Justice had previously authorized private entities in the State to offer, and only then in the same manner in which the games are offered. The State stood by this position over Pauma's objections, including one based upon the *Northern Arapaho* opinion and the holding therein that a state acts in bad faith if it is only willing to negotiate according to "state law limitations concerning a game that it permits." *Northern Arapaho,* 389 F.3d at 1313. Not only that, but the State adamantly refused to negotiate for certain non-prohibited gaming that is statutorily allowed to nonprofits, like non-banked dice games.

42. Moreover, to belabor the negotiation of new gaming rights, the State did something it has not done in other compact negotiations made public to date: after sending its first responsive draft compact in the fall of 2019, it simply refused to respond to the drafts Pauma sent for the twenty months there-after, electing instead to either ignore them outright or simply make revisions to the last draft compact it sent so it could dodge subjects it found to be undesirable. As the most recent example, the parties had a lengthy conversation about the limited amount of time remaining on the term of the 1999 Compact at an April 2021 negotiation session, with the State communicating its expectation that the substantive negoti-ations would be complete by the beginning of December so the final compact could obtain the requisite approvals before the June 30, 2022 expiration date of the 1999 Compact. With less than eight months *tops* then remaining in the negotiations, counsel for Pauma implored the State to provide comprehensive responses to the redlines in Pauma's pending draft compact before the next negotiation session set for the beginning of June in order to show there was some "sign[ ] of life" in the negotiations. And yet, de-spite having two months in which to prepare a response, all the State did was resend its prior draft com-pact – not Pauma's – with about six (6) very limited redlines added to the one-hundred-and-forty-plus page document.

43. Nevertheless, in the hopes of finding some measure of common ground, Pauma sent one final compact offer to the State on June 4, 2021, and asked it to indicate by a date certain whether it accepted the proposal. As an alternative, Pauma also explained that it was amenable to extending the term of the 1999 Compact, which would allow the parties to continue the belabored negotiations regarding new gaming rights that have been ongoing since 2014 since the agreement's impending expiration date of June 30, 2022 would no longer be an issue.

44. On the evening of June 14, 2021, the negotiator for the State sent an e-mail in which she explained the State was not in a position to accept either one of Pauma's offers, and that she expressly "disagreed" (yet again) with, what she labelled to be, virtually every "important issue[] … raised" by the Tribe in its final offer, irrespective of whether such issues related to new gaming rights or deviations, no matter how minor, from the regulatory terms steadfastly demanded by the State. This would be the last communication Pauma received from the State as of the filing date for this Complaint.

III.   **THE REGULATORY TERMS THE STATE EITHER INSISTED UPON OR REFUSED TO NEGOTIATE**

45. This final compact offer transmitted by Pauma to the State on June 4th not only took issue with (and offered final counterproposals to) the State's positions on the new forms of class III gaming requested by the Tribe, but also the regulatory terms the State had unflinchingly insisted upon for the prior two-and-a-half years of negotiation. Some of the more significant of these are set forth below.

**ILLEGAL TAXATION (SDF)**

46. From the inception of the negotiations, the State has insisted that Pauma pay revenue sharing into a State-administered fund created under the 1999 Compact called the SDF to cover what the State labels its "25 U.S.C. § 2710(d)(3)(C) costs incurred for purposes consistent with IGRA." For reference sake, Section 2710(d)(3)(C) of IGRA allows the state to negotiate compact "provisions relating to – (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity." 25 U.S.C. § 2710(d)(3)(C).

47. And yet, the provision insisted upon by the State goes much further than Section 2710(d)(3)(C) allows by requiring Pauma to cover costs associated with subjects that are either unrelated or antithetical to the purpose of IGRA, like "statewide general administrative expenses," "supplemental pension payments," and the salaries, benefits, and expenses incurred by the employees of the Indian and Gaming Law section of the California Department of Justice, regardless of the work being performed. What this last point means is that *tribes* are paying for the *State* to conduct yearslong compact negotiations and/or defend bad faith suits, which removes any financial disincentive to negotiating lackadaisically, obstinately defending disputes that should be settled, or engaging in measured and sophisticated forms of bad faith.

48. By insisting upon the payment of fees beyond that which are necessary to defray the State's

COMPLAINT OF PAUMA BAND OF MISSION INDIANS

1   actual and reasonable costs of regulating under the compact, the State has tried to impose a tax, fee,

2   charge, or other assessment on Pauma in violation of IGRA, and thus failed to negotiate in good faith.

3                               **ILLEGAL TAXATION (RSTF)**

4        49. From the inception of the negotiations, the State has insisted that Pauma pay revenue sharing

5   into a State-administered fund created under the 1999 Compact called the RSTF, the original purpose of

6   which was to provide each non- and limited-gaming tribe with $1.1 million in annual financial support.

7        50. And yet, the provision insisted upon by the State goes much further than this by earmarking

8   such revenue sharing for a second fund called the Tribal Nations Grant Fund, an arguably politicized

9   fund through which the State or State-appointees award discretionary grants (not fixed sums) to Indian

10  tribes of their choosing for purposes of their choosing, instead of Pauma doing the same or devoting

11  such monies to its own local community in order to better the quality of life for its members and neigh-

12  bors. To help explain the problem with this, twice within the past year, the State, in widely-publicized

13  incidents, attempted to place sexually violent predators being released from custody in houses adjacent

14  to the Pauma reservation, and just a short distance from the tribal elementary school. No matter the

15  counterargument, the excess monies demanded by the State under the RSTF provision in the compact

16  would be better served going towards pressing *local* needs, such as funding SVP education programs,

17  community watch groups, and lobbying efforts to help persuade the State to craft more appropriate

18  placement policies so it will stop trying to situate persons it deems undesirable next to Indian reser-

19  vations.

20       51. By insisting upon the payment of fees beyond that which are necessary to provide non- and

21  limited-gaming tribes with $1.1 million in annual financial support, the State has tried to impose a tax,

22  fee, charge, or other assessment on Pauma in violation of IGRA, and thus failed to negotiate in good

23  faith.

24       **REFUSING TO NEGOTIATE FOR AN ENFORCEABLE FORM OF EXCLUSIVITY**

25       52. According to the Ninth Circuit, the only reason the State is able to receive RSTF and SDF

26  revenue sharing under the 1999 Compact is because it supported Proposition 1A, and thus "in exchange"

27  for its financial demands gave tribes "an exclusive right to conduct class III gaming in the most popu-

28  lous State in the country." *Coyote Valley II*, 331 F.3d at 1114-15.

53. This consideration of exclusivity was expended in connection with executing the 1999 Compacts, and thus the State needs to offer something different in order to support these revenue sharing demands. *See Rincon II*, 602 F.3d at 1037 ("[I]n the current legal landscape, 'exclusivity' is not a new consideration the State can offer in negotiations because the tribe already fully enjoys that right as a matter of state constitutional law. Moreover, the benefits conferred by Proposition 1A have already been used as consideration for the establishment of the RSTF and SDF in the 1999 Compact. … 'It is elementary law that giving a party something to which he already has an absolute right is not consideration to support that party's contractual promise.'" (citations omitted)). But, it has failed to do that. Not only that, but the Ninth Circuit recently revealed that the exclusivity created through Proposition 1A may be of significantly less value than originally thought since the current compacts do not appear to provide a way of enforcing it. *See Yocha Dehe Wintun Nation*, 830 F. App'x at 551. In an attempt to rectify this, Pauma proposed redlines that would give Constitutional exclusivity some teeth by either allowing the Tribe to enjoin the licensure of any new non-tribal entrants into the class III gaming field or to require the State to pay damages if it repeals exclusivity during the life of the compact (which, in reality, just applies the existing waiver of sovereign immunity in Section 98005 of the Government Code that the State is trying to eliminate under the compact). However, the State rejected or ignored any and all redlines Pauma proposed on the subject of devising an enforceable form of exclusivity.

54. By refusing to consider any of Pauma's redlines that would provide the Tribe with an enforceable form of exclusivity, the State has both directly acted in bad faith and indirectly acted in bad faith by insisting upon revenue sharing without providing the underlying consideration necessary to obtain it.

**THE MOU REQUIREMENT**

55. From the inception of the negotiations, the State has insisted that Pauma execute MOUs with the County of San Diego and the California Department of Transportation every time the Tribe undertakes a "Project" during the life of the compact so as to both mitigate the alleged adverse environmental effects of such and also pay "[c]ompensation for law enforcement, fire protection, emergency medical services and any other public services to be provided by the County… as a consequence of the Project," for the "[m]itigation of any effect on public safety attributable to the Project," and for the "mitigation of

1   all traffic impacts on the state highway system and facilities attributable to the Project."

2   56. Fortunately, Pauma has experience with this MOU requirement under a prior amended com-

3   pact that was induced by State misrepresentations and ultimately rescinded by the Ninth Circuit. *See*

4   *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155

5   (9th Cir. 2015). That amended compact contained a substantively-identical MOU provision, which con-

6   sequently resulted in Pauma executing a MOU with the County of San Diego that would have required,

7   *inter alia*, $38 million in road improvements, $400,000 annually for sheriff support, $200,000 annually

8   for programs designed to address gambling addiction, $40,000 annually for the prosecution of Indian-

9   gaming-related crimes, the construction of a state-of-the-art wastewater treatment plant, and the con-

10   struction and staffing of an eleven-person and three-engine fire department.

11   57. Not only that, but IGRA is written such that the Secretary of the Interior carries out the

12   federal government's trust obligations towards Indian tribes by reviewing compacts – and especially the

13   financial terms therein – immediately following execution to make sure they comply with IGRA, other

14   federal laws, and the aforesaid "trust obligations of the United States to Indians." 25 U.S.C. §

15   2710(d)(8)(B). These MOUs are structured, however, to evade the Secretarial review process created by

16   Congress because they are only generally and vaguely described in the compact itself, with the actual

17   agreements not coming into existence until long after the compact has been approved.

18   58. By insisting upon the payment of substantial fees that are structured in such a way so as to

19   avoid Secretarial review, the State has both tried to impose a tax, fee, charge, or other assessment on

20   Pauma as well as violate the compacting process that Congress designed in IGRA, and thus, for either

21   reason, has failed to negotiate in good faith.

22   **THE TLRO REQUIREMENT**

23   59. From the inception of the negotiations, the State has insisted upon including in the compact

24   thirteen (13) pages of State-based labor laws that is has labelled with the misnomer the Tribal Labor

25   Relations Ordinance.

26   60. During the negotiations for the 1999 Compact, then-Governor Gray Davis demanded that

27   Indian tribes sit down with certain prominent and politically-influential labor unions and devise a

28   watered-down version of the modern-day TLRO specifically because the NLRA did not apply to the on-

reservation commercial enterprises of Indian tribes at the time. *See Coyote Valley II*, 331 F.3d at 1116; *Fort Apache Timber Co.*, 226 N.L.R.B. 503 (1976). However, all of this changed in early 2007 when a federal circuit court applied the NLRA to a tribal gaming facility located on the outskirts of Los Angeles. *See San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306 (D.C. Cir. 2007). Since then, Indian tribes in California have been expected to somehow comply with *both* the TLRO and the NLRA even though there is inherent tension between these two sets of authorities. One example of this is the "binding dispute resolution" provision of the TLRO that states "[a]ll [labor] issues shall be resolved exclusively through the binding dispute resolution mechanism herein." The tribal employer is held to this arbitration requirement. Labor unions that contend they are not parties to the compact, on the other hand, are not, and ultimately forum shop based upon their objectives. For instance, a labor union intent on waging a "corporate campaign" will file one unfair labor practice charge after the next with the National Labor Relations Board ("NLRB") in the hopes of financially coercing a tribe to execute a collective bargaining agreement, irrespective of what its employees actually want. On the other hand, a labor union hoping for either a quick decision or a less visible forum in which to raise specious issues will instead cast aside the standing defense and invoke the arbitration process of the TLRO. *See UNITE HERE Local 30 v. Sycuan Band of Kumeyaay Nation*, No. 20-01006-W-DEB, Dkt. No. 1 (S.D. Cal. June 1, 2020). This is but one problem created by the overlapping sets of authorities, and it causes tribes considerable strife in trying to handle the often competing interests of labor unions and the casino workforce. What is more, Indian tribes in the State have thus far been unsuccessful in convincing a federal court to address the compatibility of the NLRA and the TLRO. *See Unite Here Local 30 v. Sycuan Band of Kumeyaay Nation*, 2020 U.S. Dist. Lexis 232445 (S.D. Cal. Dec. 10, 2020) ("[T]he Court declines to exercise supplemental jurisdiction over the Tribe's counterclaim, which requests a declaration that the contract is void due to preemption of the TLRO by the NLRA."). What this means is that perhaps the only way to address this issue is prospectively, by having a federal court hold that the State negotiated in bad faith by demanding the TLRO at a point in time when the NLRA already applies.

61. By insisting upon the adoption of a rigorous and often conflicting set of State labor laws at a point in time that the NLRA applies to the gaming facilities of Indian tribes, the State has failed to negotiate in good faith.

## VIOLATION/MATERIAL BREACH LANGUAGE

62. From the inception of the negotiations, the State has insisted upon riddling the draft compact with one-sided language of "violations" and "material breach[es]." According to the compact, one or the other of these things occurs if there is any failure by Pauma to make timely revenue sharing payments, "to remedy within a reasonable period of time any material and timely raised [building code] deficiency," "to correct all deficiencies identified within a [fire and life safety inspection] report within a reasonable period of time," to comply with "public health standards for food and beverage handling," to comply with "federal water quality and safe drinking water standards applicable in California," to prepare an environmental impact report in connection with any Project that – in the State's estimation – satisfies the requirements of the compact, or to adopt a tribal ordinance governing the procedures for handling the harassment, retaliation or employment discrimination claims by employees that are supposed to be dealt with through insurance (*see* ¶ 71(c)).

63. However, any deviation from the requisite standards does not simply empower the State to asses an appropriate fine against the Tribe or to seek some narrowly-tailored injunctive relief in order to remedy the perceived deficiency. Rather, the compact contains material breach provisions in a dispute resolution section authored by the State that would allow it to hail the Tribe into federal court and seek an order terminating the compact upon a showing that "(i) the respondent party has breached its Compact obligations, and (ii) the respondent party failed to cure the material breach within the time allowed [by the court]." While the State obviously thinks termination is an appropriate *contract* remedy, a *compact* is not just any contract. Rather, here as in the labor context under the NLRA, "the relationship between the parties is… a continuing one," each party is "bound to deal exclusively with the other," and "there is… public interest in a successful outcome" to the negotiations at issue. 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.26c. Meaning of Fair Dealing, p. 402 (3d ed. 2004); *see* 25 U.S.C. § 2702(1) (explaining the purpose of IGRA is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments"). Thus, the remedies desired by the State for rectifying perceived problems in carrying out the compact should have been more attuned to the identity of the other contracting party, the nature of the relationship, and the purpose of the negotiations.

64. By insisting upon the inclusion of unilateral "violation" and "material breach" language throughout the compact that could lead to the termination of the agreement, the State has failed to negotiate in good faith.

**REFUSING TO CONFINE THE NEGOTIATIONS TO THE GOVERNOR**

65. According to Article IV, Section 19(f) of the California Constitution, the "Governor is authorized to *negotiate* and conclude compacts, subject to *ratification* by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally-recognized Indian tribes on Indian lands in California in accordance with federal law." Cal. Const. art. IV, § 19(f) (emphasis added). The term "ratification" is generally understood to mean the "binding adoption of an act already completed," such as "action taken by the legislature to make binding a treaty negotiated by the executive." Black's Law Dictionary 1513 (11th ed. 2019); *see* Webster's New Int'l Dictionary 2066 (2d ed. 1941) (defining "ratify" as "[t]o approve and sanction, esp. formally, as the act of an agent or servant; to make valid or legally operative; to confirm; as, the Senate *ratified* the treaty… .").

66. Bearing in mind the foregoing terminology, Pauma sent redlines to the State to ensure there would be no hidden, last-minute pre-conditions for obtaining the legislative ratification of the compact, including any veiled demand for the execution of a collective bargaining agreement with a particular union. To wit, Pauma proposed the following section to the State for inclusion in the compact:

12.12. No External Preconditions to Approval or Ratification including a Collective Bargaining Agreement

All of the terms required by the State for the approval of this Compact are set forth herein, and thus the State shall not require any additional concessions outside of this Compact for its approval or ratification. To that end, the State, whether through the Office of the Governor, the Legislature, or otherwise, shall not ask, demand, or otherwise make it a condition that Pauma or its subordinate gaming facility negotiate or execute a collective bargaining agreement, or any other similar contract, with UNITE HERE International Union or any other labor organization in order to obtain the legislative ratification of this Compact.

And yet, the State outright rejected this proposal, explaining that it "does not accept this addition" because "[t]he legislature is a separate and coequal branch of State government that exercises Constitutional authority by considering for ratification tribal state gaming compacts," during which "[i]t is not at

**COMPLAINT OF PAUMA BAND OF MISSION INDIANS**

all unusual for either party to raise issues material to ratification." In other words, the California Legislature *can* negotiate with an Indian tribe and *does* demand additional concessions outside of the compact for securing the ratification of the agreement. In addition to being patently illegal under State and federal law, this state of affairs would likely create a duress-like situation for Pauma in which the Tribe would have to acquiesce to whatever the California Legislature extracontractually demanded on top of the terms in the compact under consideration so the Tribe would not be left without a successor compact on the eve of the June 30, 2022 expiration date of the 1999 Compact.

67. By refusing to consider any of Pauma's redlines that would confine the negotiating authority to the Governor and the negotiated terms to the compact, the State has failed to negotiate in good faith.

## REFUSING TO CONFINE THE REGULATIONS TO THE COMPACT

68. In keeping with the preceding paragraphs, the compact is supposed to be the mechanism through which a state has a role in the regulation of class III gaming. After all, states do not have civil regulatory authority over Indian reservations (*see California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987)), and the text of IGRA explains that the compact "govern[s] the conduct of gaming activities" and "may include provisions relating to" the seven topics of negotiation set forth within the statute. 25 U.S.C. §§ 2710(d)(3)(A), (d)(3)(C).

69. And yet, the State is trying to turn the compact into an anachronism, an outmoded vessel through which it can exert general regulatory authority over tribal gaming facilities. To wit, from the inception of the negotiations, the State has insisted upon including escape hatch provisions that would allow the State Gaming Agency to adopt regulations outside of the compact which it would then present for approval, in some circumstances, to an "Association" largely comprised of "two (2) representatives from each tribal gaming agency." In other words, the State has created an unbalanced regulatory body comprised of the State Gaming Agency on one side and representatives from *all of the* gaming tribes on the other. The State Gaming Agency can then devise a regulation it wants to impose against the tribes outside of the compacts and the Association, at most, collectively votes on whether to approve or disapprove the regulation. What this means is the compact is creating a situation whereby other tribes who may be prone to capitulate to the rather persuasive State of California have the power to encroach upon Pauma's sovereignty and permit the State to civilly regulate outside of the compact. To try and correct

this problem, Pauma proposed redlines that would allow the State to incorporate the existing State regulations into the compact, while asking the State to use the amendment and/or renegotiation processes in Section 15.0 of the compact – just as the Tribe has to do – to address new issues that may come up during the life of the agreement. However, the State refused to respond to these redlines.

70. By refusing to consider Pauma's redlines that would confine the State regulations to the compact itself, the State has failed to negotiate in good faith.

**OTHER COMPACT PROVISIONS THAT ARE NOT DIRECTLY RELATED TO THE REGULATION OF CLASS III GAMING**

71. From the inception of the negotiations, the State has insisted upon a slew of other overbroad or extraneous provisions in the compact that would greatly increase the costs of doing business, including the following:

a) defining the term "Gaming Facility" to include structures and areas other than the casino itself;

b) defining the term "Project" to include undertakings that could also serve the tribal community;

c) requiring Pauma to obtain $3,000,000 in per-occurrence insurance coverage for claims by employees of unlawful harassment, retaliation or discrimination, *and* to waive the Tribe's sovereign immunity up to the limit of the policy *even though* the insurer is supposed to be responsible for redressing such claims;

d) requiring Pauma to obtain $10,000,000 in per-occurrence insurance coverage for claims of bodily injury, personal injury, and property damage arising out of the operation of the Gaming Facility, and to waive the Tribe's sovereign immunity up to the limit of the policy *even though* the insurer is supposed to be responsible for redressing such claims;

e) prohibiting Pauma "from cashing any check drawn against a federal, state, county, or city fund, including but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments;"

f) requiring Pauma to comply with the State of California's minimum wage law; and,

g) requiring the enforcement of State "earning withholding orders for support of a child, spouse, or former spouse."

72. Yet, the list of permissible subjects of negotiation in IGRA only allows States to negotiate over those subjects that are "directly related to the operation of gaming activities," which the foregoing are not. 25 U.S.C. § 2710(d)(3)(C)(vii). On top of which, the State has not offered any concessions – let alone meaningful ones – in order to demand such terms in return. *See, e.g.*, *Big Lagoon Rancheria v. California*, 759 F. Supp. 2d 1149, 1162 (N.D. Cal. 2010), *aff'd by* 789 F.3d 947 (9th Cir. 2015) (*en banc*)) (holding that "to negotiate for environmental mitigation measures in good faith, the State must offer a meaningful concession in exchange" (citing *Coyote Valley II*, 331 F.3d at 1116-17)).

73. By insisting upon the inclusion of the foregoing subjects in the compact that are neither directly related to the operation of gaming activities nor counterbalanced by any meaningful consideration, the State has failed to negotiate in good faith irrespective of whether the issues are analyzed individually or collectively.

## FIRST CLAIM FOR RELIEF

## [FAILURE TO NEGOTIATE IN GOOD FAITH – 25 U.S.C. § 2710(d)(7)(A)(i)]

## [AGAINST GOVERNOR GAVIN NEWSOM AND THE STATE OF CALIFORNIA]

74. Pauma incorporates by reference the preceding general allegations as if set forth in full.

75. More than one-hundred and eighty (180) days have elapsed since Pauma commenced negotiations with Governor Newsom in February 2019, and yet the parties have failed to enter into a tribal/state compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

76. As detailed in the preceding general allegations, Pauma has introduced evidence that the State has failed to respond to the Tribe's request to negotiate a compact in good faith according to the following discreet counts of this First Claim for Relief, irrespective of whether such counts (and conduct raised therein) are considered individually or collectively:

**Count 1:** Failing to offer meaning concessions for its revenue sharing and other extraneous demands;

**Count 2:** Insisting upon the payment of revenue sharing into the SDF to cover costs not directly related to the regulation of Indian gaming (*see, e.g.*, ¶¶ 46-48);

**Count 3:** Insisting upon the payment of revenue sharing into the RSTF above and beyond what is needed to provide each non- and limited-gaming tribe with $1.1 million of annual financial

COMPLAINT OF PAUMA BAND OF MISSION INDIANS

support (*see*, *e.g.*, ¶¶ 49-51);

**Count 4:** Refusing to negotiate for an enforceable form of exclusivity in the compact (*see*, *e.g.*, ¶¶ 52-54);

**Count 5:** Insisting upon the execution of costly MOUs that evade the Secretarial review process in IGRA every time Pauma undertakes a "Project" during the life of the compact (*see*, *e.g.*, ¶¶ 55-58);

**Count 6:** Insisting upon the execution of thirteen pages of State labor laws inaptly known as the TLRO when the NLRA applies to the gaming facilities of Indian tribes and where there is material conflict between these two sets of authorities (*see*, *e.g.*, ¶¶ 59-61);

**Count 7:** Insisting upon littering the compact with violation/material breach language that provides the State with the ability to seek compact termination as a potential remedy (*see*, *e.g.*, ¶¶ 62-64);

**Count 8:** Refusing to confine the negotiations to the Governor and the negotiation demands to the compact itself (*see*, *e.g.*, ¶¶ 65-67);

**Count 9:** Refusing to confine regulatory terms to the compact by allowing the State Gaming Agency to issue civil regulations – over Pauma's objections – during the life of the agreement (*see*, *e.g.*, ¶¶ 68-70);

**Count 10:** Insisting upon a slew of other provisions that are not directly related to the operation of gaming activities, such as by a) defining the term "Gaming Facility" to include structures and areas other than the casino itself; b) defining the term "Project" to include undertakings that also could serve the tribal community; c) requiring Pauma to obtain $3,000,000 in per-occurrence insurance coverage for claims by employees of unlawful harassment, retaliation or discrimination, *and* to waive the Tribe's sovereign immunity up to the limit of the policy even though the insurer is supposed to be responsible for redressing such claims; d) requiring Pauma to obtain $10,000,000 in per-occurrence insurance coverage for claims of bodily injury, personal injury, and property damage arising out of the operation of the Gaming Facility, and to waive the Tribe's sovereign immunity up to the limit of the policy even though the insurer is supposed to be responsible for redressing such claims; e) prohibiting Pauma "from cashing any check drawn

against a federal, state, county, or city fund, including but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments;" f) requiring Pauma to comply with the State of California's minimum wage law; and g) requiring the enforcement of the State's "earning withholding orders for support of a child, spouse, or former spouse" (*see*, *e.g.*, ¶¶ 71-73);

**Count 11:** Refusing and otherwise failing to negotiate for forms of class III gaming that are allowed to Pauma under IGRA – including the specific games requested by the Tribe – on account of the lottery provisions in both Section 19(d) and Section 19(f) of Article IV of the California Constitution (*see*, *e.g.*, ¶¶ 34-35, 40);

**Count 12:** Refusing and otherwise failing to negotiate for forms of class III gaming that are allowed to Pauma under IGRA – including the specific games requested by the Tribe – on account of the cardrooms around the State of California commercially offering tile games (*see*, *e.g.*, ¶¶ 36-37, 41);

**Count 13:** Refusing and otherwise failing to negotiate for forms of class III gaming that are allowed to Pauma under IGRA – including the specific games requested by the Tribe – on account of nonprofits having the statutory ability to operate "controlled games" at fundraisers under Sections 19985 to 19987 of the Business and Professions Code (*see*, *e.g.*, ¶¶ 38-39, 41);

**Count 14:** Engaging in protectionism by contending, without support, that Pauma offering lottery games would, *inter alia*, harm the California State Lottery's brand, reduce the State Lottery's revenues, siphon money from State Lottery retailers, and confuse the general buying public (*see*, *e.g.*, ¶ 40); and,

**Count 15:** Engaging in surface bargaining with respect to any and all of Pauma's requests for new class III gaming rights (*see*, *e.g.*, ¶¶ 40-42).

77. The "burden of proof shall," therefore, "be upon the State to prove that the State has negotiated with [Pauma] in good faith to conclude a Tribal-State compact governing the conduct of gaming activities" (*see* 25 U.S.C. § 2710(d)(7)(B)(ii)), which the State is incapable of carrying since, *inter alia*, it insisted upon the terms it desired, refused to consider the terms it did not, and never provided material concessions for any of its demands.

78. This failure to negotiate in good faith by the State thus necessitates a concomitant finding of such by the Court as well as the triggering of the tripartite remedial process set forth within Section 2710(d)(7)(B) of IGRA that is designed to "expedite" the conclusion of a compact or a compact-like mechanism. *See* 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *Rincon II*, 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## PRAYER FOR RELIEF

WHEREFORE, the Pauma Band of Mission Indians prays as follows:

1. That the Court find that the State failed to negotiate in good faith under Section 2710(d)(7)(B)(iii) of IGRA and trigger the statutory remedial process set forth in Section 2710(d)(7)(B)(iii)-(vii).

2. That the Court toll the expiration date of the 1999 Compact and/or enjoin, estop, or otherwise prevent the State from taking any adverse actions against Pauma, its gaming facility, the employees thereto, or the customers or vendors thereof on account of any supposed violation(s) of the 1999 Compact, IGRA, or other federal or State gaming-related laws if the disposition of this lawsuit or any attendant remedial process continues past the June 30, 2022 expiration date of the 1999 Compact;

3. That the Court award Pauma its costs of suit and attorneys' fees as allowed by law or equity; and,

4. That the Court award any other relief that may be available under the waivers in Section 9.4(a) of the 1999 Compact or Section 98005 of the Government Code as a result of the State's failure to negotiate in good faith.

RESPECTFULLY SUBMITTED this 30th day of June, 2021

PAUMA BAND OF MISSION INDIANS

By: */s/ Kevin M. Cochrane*
Kevin M. Cochrane
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
836 57th Street, Suite 472
Sacramento, CA 95819
Telephone: (916) 431-0126